<div style="border:1px solid">Not For Publication</div>

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 05-34871 (LMW) |
| | ) | | |
| HARRY C. CHIAPPONE, | ) | CHAPTER | 7 |
| | ) | | |
| DEBTOR. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| BRENDA RIOLES and | ) | ADV. PRO. NO. | 05-3181 (LMW) |
| CHRISTINE C. CHIAPPONE, | ) | | |
| | ) | DOC. I.D. NO.  1 | |
| PLAINTIFFS | ) | | |
| | ) | | |
| vs. | ) | | |
| | ) | | |
| HARRY C. CHIAPPONE, | ) | | |
| | ) | | |
| DEFENDANT. | ) | | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## **APPEARANCES**

| | |
|---|---|
| Christopher M. Lefebvre, Esq.<br>P.O. Box 479<br>Pawtucket, RI 02862 | Attorney for the Plaintiffs, *Pro Hac Vice* |
| Zenas Zelotes, Esq.<br>Zenas Zelotes LLC<br>P.O. Box 7123<br>Groton, CT 06340 | Local Counsel for the Plaintiffs |
| John M. Barton, III, Esq.<br>Law Offices of John M. Barton, III<br>P. O. Box 901<br>Orange, CT 06477 | Attorney for the Defendant/Debtor |

<u>**MEMORANDUM OF DECISION**</u>

Lorraine Murphy Weil, United States Bankruptcy Judge

The matter before the court is the above-referenced plaintiffs' ("Plaintiff Rioles" and "Plaintiff Chiappone," collectively, the "Plaintiffs") Complaint To Determine Non-Dischargeability of Debts (A.P. Doc. I.D. No. 1, the "Complaint")[1] pursuant to which the Plaintiffs seek a determination that certain debts (the "Debts")[2] due from the above-referenced debtor (the "Debtor") were not discharged in this chapter 7 case pursuant to 11 U.S.C. §§ 523(a)(5) and/or 523(a)(15).[3] The court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[4]

## I.    <u>PROCEDURAL BACKGROUND</u>

### A.    <u>The Chapter 7 Case</u>

This case was commenced by the Debtor pursuant to a voluntary petition filed with the court on September 22, 2005 (the "Petition Date"). (Case Doc. I.D. No. 2.) A complete set of schedules (*see id.*, collectively, the "Schedules") was filed along with the petition. There is no property listed

---

[1]    Citations herein to the docket of this adversary proceeding are in the following form: "A.P. Doc. I.D. No. ___." Citations herein to the docket of this chapter 7 case are in the following form: "Case Doc. I.D. No. ___."

[2]    The Plaintiffs also argue in their briefs that a certain Debt is not a "debt" at all but, rather, rises to the level of a property interest in the 401k (as hereafter defined).

[3]    References herein to title 11 of the United States Code and/or to the Bankruptcy Code are references to the same as they existed prior to their amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

[4]    That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings arising under Title 11, U.S.C., or arising in . . . a case under Title 11, U.S.C. . . . ."

in Schedule A (Real Property).  Schedule B (Personal Property) lists two assets: a certain "Connex

Credit Union checking account" with a then current value of $150.00 and a certain "Mashantucket

ERISA-401k" (the "401k") with a then current value of $142,893.00.  Schedule C (Property Claimed

as Exempt) claims the full value of the 401k as exempt pursuant to Bankruptcy Code § 522(b)(2).[5]

Schedule F (Creditors Holding Unsecured Nonpriority Claims) contains a listing of claims

in the aggregate amount of $334,601.24.  Of these claims, several are listed as owing to Plaintiff

Chiappone in the total amount of $186,134.75.  (*See* Case Doc. I.D. No. 2.)  Also listed is a claim

owing to Plaintiff Rioles for attorney's fees (the "Attorney's Fees") in the amount of $15,000.00.

(*See id.*)

According to Schedule I (Current Income of Individual Debtor(s)), as of the Petition Date the

Debtor was employed at Mashantucket Pequot Gaming ("Foxwoods Casino") receiving a monthly

net income of $3,145.97.  Schedule J (Current Expenditures of Individual Debtor) lists monthly

expenses (not including any of the Debts at issue here) in the aggregate amount of $3,699.14 as of

the Petition Date.

A report of no distribution was filed by the chapter 7 trustee on November 4, 2005.  (Case

Doc. I.D. No. 9.)  On January 12, 2006, the Debtor was granted his chapter 7 discharge.  (Case Doc.

I.D. No. 11.)

## B.   The Adversary Proceeding

The Plaintiffs commenced this adversary proceeding by filing the Complaint on December

28, 2005.  (A.P. Doc. I.D. No. 1.)  The Complaint seeks a determination that the Debts owing to the

---

[5]      The 401k is not property of the estate in any event.  *See Patterson v. Shumate,* 504
U.S. 753 (1992).

Plaintiffs are nondischargeable under 11 U.S.C. §§ 523(a)(5) and/or 523(a)(15). The Debtor filed his answer to the Complaint on November 6, 2006, denying the substantive allegations. (A.P. Doc. I.D. No. 30.) A trial (the "Trial") on the Complaint was held on November 6, 2006 (the "Trial Date"). The Plaintiffs produced one witness, Plaintiff Chiappone, and introduced various items of documentary evidence into the record.[6] Of particular relevance is a decision issued by the Rhode Island Family Court (the "Family Court") entitled "Decision Pending Entry of Final Decree" (the "Divorce Decree", Exh. A) dated March 29, 2004 which is discussed in greater detail below. The Debtor testified on his own behalf and produced several items of documentary evidence. At Trial, counsel for the parties agreed that the dischargeability of six Debts owing from the Debtor to the Plaintiffs pursuant to the Divorce Decree was at issue. Those Debts are: 1) $24,000.00 in back payments on temporary court orders (the "Temporary Orders") owed to Plaintiff Chiappone; 2) Plaintiff Chiappone's sixty-five percent (65%) share of the 401k; 3) Plaintiff Chiappone's share of $19,500.00 in the Debtor's former company, Torino Designs ("the Business Share"); 4) sixty-five percent (65%) of a bank account with the Washington Trust Bank (the "Bank Account") formerly held by the Debtor; 5) the Attorney's Fees owed to Plaintiff Rioles; and 6) rehabilitative alimony (the "Rehabilitative Alimony") in the amount of $125.00 per week payable to Plaintiff Chiappone until payments are completed on the foregoing Debts. At the conclusion of the Trial, the court took the matter under advisement subject to post-Trial briefing. In an order dated June 14, 2007, the court requested that the parties brief certain issues in respect of applicable (Rhode Island) law. (*See* A.P. Doc. I.D. No. 43.) The parties complied with that request (*see* A.P. Doc. I.D. Nos. 46 (Debtor's

---

[6]     References herein to those exhibits appear in the following form: "Exh. __."

brief), 47 (Plaintiffs' brief)) and that briefing now is complete.  All other post-Trial briefing also is complete.

As all post-Trial briefing now is complete, the court is prepared to issue this decision on the Complaint.

## II.    <u>FACTS</u>[7]

Plaintiff Chiappone and Debtor were married on June 17, 1989.  The marriage produced two children.[8]  (Exh. A ¶¶ 2-3, at 1.)  The couple separated in July of 1999, and marital dissolution proceedings were commenced by Plaintiff Chiappone against the Debtor in the Family Court.  On March 29, 2004, following the contested divorce proceedings the Family Court issued the Divorce Decree.  Prepetition, the Debtor appealed the Family Court's Divorce Decree before the Rhode Island Supreme Court.  That appeal (the "Appeal") has been stayed pending the resolution of this adversary proceeding.

The Divorce Decree states in pertinent part:

> [T]he Court finds that [the Debtor] . . . neglected to pay basic utilities, such as gas and electric, that he was required to pay under the [T]emporary Orders . . . and that the Debtor] willfully violated the letter, and worse, the spirit of the [Temporary Orders] in this case . . . . [The Debtor] is found in willful contempt for failing to pay in excess of $16,000 in car payments [and] in excess of $8,000.00 in other debts that were his obligation [under such orders] . . . .

(Exh. A ¶ 11, at 3; ¶¶ 26-27, at 5.)

---

[7]      The facts set forth in this section (and elsewhere in this opinion) are taken from the Trial record and the chapter 7 case file.  A transcript (the "Transcript") of the Trial appears in the adversary proceeding docket as A. P. Doc. I.D. No. 37.

[8]      Plaintiff Chiappone was awarded sole custody of the children (ages sixteen and ten as of the Trial Date) in the Divorce Decree.  (Exh. A ¶ 2, at 6.)

- 5 -

Based on [Rhode Island law] . . . and most especially the [Debtor's] egregious conduct, this Court determines that an equitable division of the assets of this marriage to be as follows: . . . [sixty-five percent (65%) of the assets to Plaintiff Chiappone and thirty-five percent (35%) to the Debtor]. The disproportionate division of said assets is in no small measure due to the [Debtor's] . . . contemptible behavior.

(*Id.* ¶ 28, at 5.)

[The Debtor's 401k] . . . that he has through his employment at Foxwoods Casino shall be so divided by means of a qualified domestic relations order [a "QDRO"[9]] or the like . . . .

(*Id.* ¶ 7, at 7.)

[The Debtor] shall pay to . . . [Plaintiff Chiappone] the sum of $19,500.00 representing her interest in the business which was known as [Torino Designs] . . . .

(*Id.* ¶ 17, at 8.)

[T]he Court finds that there was a Washington Trust Bank account with a balance of approximately $64,000.00 when [the Debtor] . . . left the marriage. [The Debtor] withdrew and deposited the monies elsewhere using them for what he describes as his survival; spending in excess of $103,000.00 over several years on himself, while at the same time, spending less than half that amount on his family. . . . Plaintiff [Chiappone] is awarded sixty-five (65%) percent of the $64,000.00 checking account balance with the Washington Trust Company existing at the time of the parties [sic] separation, and/or the sum of forty-one thousand six hundred ($41,600.00) dollars . . . .

(*Id.* ¶ 10, at 3 – ¶ 8, at 7.)

[T]he Court finds as to [the Attorney's Fees] . . . , there is no question that many hours of trial and investigations went into the preparation OF THIS CASE ON BEHALF OF Plaintiff [Chiappone]. The law requires that the Court make a finding of an ability on the part of the [Debtor] to contribute to same before awarding a contribution. The [Debtor] works at Foxwoods Casino. He earns $1000.00 per week. Even if the Court imputes an earning capacity to [Plaintiff Chiappone], which

---

[9]    A QDRO is an order that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C.A. § 1056(d)(3)(B) (West 2007).

- 6 -

the Court has done, it does not place [Plaintiff Chiappone] in the [Debtor's] category of earners. The Court finds that the [Debtor] has not honored his monetary obligations to his family, but for his child support order, using the monies that rightfully should have gone to [Plaintiff Chiappone's] household to buy household furnishings and effects; to pay some of [his acquaintance's] . . . bills; and her rent, etc. The Court further finds that there is even evidence on the record that the [Debtor] made a one-shot payment of $10,000.00 on one of his credit cards. The bottom line is there is money available when the [Debtor] wants money to be available. [T]he Courts [sic] orders that [the Debtor] contribute $15,000.00 toward [Plaintiff Chiappone's] counsel fee to [Plaintiff Rioles] . . . and he shall pay the same within ninety (90) days of February 16, 2004; and, the defendant may satisfy this obligation by borrowing against his interest in his 401k plan.

(*Id.* ¶ 30, at 5-6 – ¶ 22, at 8.)

The Court finds that view [sic] of the assignment of assets, to the Plaintiff totaling in excess of one hundred thousand ($100,000.00) dollars, this Court would not ordinarily award rehabilitative alimony, and the Court will not do so here, assuming the [Debtor] pays the [monies] awarded to [Plaintiff Chiappone]. However, until such time as the [Debtor] pays said monies, the Court awards to Plaintiff [Chiappone] the sum of $125.00 per week in [Rehabilitative Alimony] . . . . Upon the payment of said monies awarded herein to [Plaintiff Chiappone], [she] is denied alimony.

(*Id.* ¶ 31, at 6 – ¶ 18, at 8.)

At Trial, Plaintiff Chiappone testified that the Temporary Orders consisted of utility payments, automobile payments and insurance on her 1998 Volvo, health care "co-pays," nursery school fees, children's piano lessons, and payments on her life insurance policy. Although the Debtor made a certain number of payments in that regard, he subsequently ceased making such payments and, as a result, the gas at Plaintiff Chiappone's residence was turned off on two occasions. (*See* Transcript at 12-15.) As of the Trial Date, the Debtor's 401k was valued at $151,677.19. (*Id.* at 8.) The Debtor ceased making contributions to the account approximately three years prior, at which point his employer ceased making its "matching" payments. (*Id.* at 47-48, 56.)

Plaintiff Chiappone is about forty-eight years old.  She currently lives with her two children (from her marriage to the Debtor) in an apartment in Westerly, Rhode Island owned by her mother. Plaintiff Chiappone is not required to pay rent, but she is responsible for utilities payments.  (*Id.* at 8-9, 18-19.)  Although Plaintiff Chiappone holds an Associate's Degree, she has not worked since November of 1995, with her only source of income at the time of the divorce being that of the Debtor.  (*Id.* at 10-11; Exh. B.)  Approximately two years prior to the Trial, Plaintiff Chiappone underwent two operations to remove a cervical bone tumor, resulting in the loss of "some control" of her right arm.  (*Id.* at 17.)  She testified that she was undergoing physical therapy to alleviate "nerve pain" which, after she "stay[s] up for a few hours," forces her to lie down for two or three hours, thereby compromising her ability to work.  (*Id.* at 17-18.)

Plaintiff Chiappone's primary source of income since the inception of divorce proceedings are child support payments in the amount of $150.00 made on a weekly basis by the Debtor.  She also receives financial assistance from family members and heating assistance from  South County Community Action.  (*Id.* at 12, 21.)  The Debtor never paid her any of the Rehabilitative Alimony ordered by the Family Court.  (*Id.* at 21.)  Plaintiff Chiappone's principal assets are a retirement account which she testified is worth between $20,000.00 and $30,000.00,[10] and various items of sixteen year-old furniture acquired during the marriage.  (*Id.* at 19-20.)  Plaintiff Chiappone testified that she has not applied for public assistance, stating that she would rather not take such action.  (*Id.* at 22.)

---

[10]    The balance on the retirement account as of August 26, 2002 was $33,577.35.  (*See* Exh. B.)  Plaintiff Chiappone testified that the account is currently unavailable to her pursuant to order of the Family Court.  (*See* Transcript at 19.)

The Debtor is about fifty-four years old.  He is a high school graduate who attended but did not complete college.  (*Id.* at 68.)  As of the Trial Date, the Debtor had been temporarily living with his seventy-seven year-old mother in Stonington, Connecticut for approximately six weeks. (*Id.* at 23, 26, 28.)  He testified that he pays her $270.00 per week in rent.  (*Id.* at 28-29.)  Prior to moving in with his mother, the Debtor lived with a certain Diane Sokoloff.  (*Id.* at 29.)  The Debtor testified that he had lived with her for "a little over five years," paying $270.00 per week for rent and utilities for approximately the last three and a half years.  (*Id.* at 29-30.)  He testified that he has never fallen behind on such payments.  (*Id.* at 65.)  As of the Trial Date, the Debtor was planning to move with Ms. Sokoloff into a condominium in East Haven, Connecticut of which she will be the sole owner. (*Id.* at 26-27.)  The Debtor testified that he will be required to pay more than the $270.00 per week he had been paying in rent, though he was uncertain as to what the new amount would be.  (*Id.* at 28.)  The Debtor stated that he never goes out for food or entertainment with Ms. Sokoloff, nor has he been on a vacation since 1999, citing a lack of money for such purposes.  (*Id.* at 66-67.)

Since February of 1992, the Debtor has worked at Foxwoods Casino and, as of the Trial Date, was a supervisor in the table games department.  (*Id.* at 23.)  Since April of 2006, he has been earning $1,100.00 per week in gross wages, an increase of $25.00 per week over his previous weekly wages.  (*Id.* at 24.)[11]  Approximately one week before the Trial, the Debtor received a $2,000.00 bonus from his employer.  It was the second such bonus the Debtor had received from Foxwoods Casino, the previous bonus having been awarded approximately one year prior.  After taxes the Debtor was left with approximately $1,300.00 from each of those bonuses.  (*Id.* at 25.)  Additionally,

---

[11]     The Debtor is an hourly employee.  (*Id.* at 32.)  His net take home pay has been consistent about ninety-five percent of the time.  (*Id.*)

the Debtor receives combined federal and state income tax refunds of between $3,500.00 and $3,600.00 per year.[12] (*Id.* at 34.) From 1996 through 2000, he operated an import/export company (the source of the Business Share) dealing in leather jackets from Italy. (*Id.* at 34-35.)

Aside from the checking account and the 401k mentioned in the Debtor's Schedules, he also owns a 1998 Nissan Maxima with around 240,000 miles which he uses to commute approximately 110 miles round trip to work. (Transcript at 46-47.) The total round trip distance will increase to 130 miles after the Debtor's planned relocation. (*Id.* at 47.) The Debtor testified to spending approximately $20.00 per day on gasoline for which he receives no mileage reimbursement from his employer. (*Id.* at 46-47.) His monthly payment on the vehicle amounts to $267.00. (*Id.* at 59.)[13] He also testified that he could not obtain a job located closer to his residence that would pay a similar wage. (*Id.* at 68.) The Debtor holds no other retirement accounts apart from the 401k. (*Id.* at 47.) He previously held a one-third survivorship interest in his mother's three-bedroom, one-family house which is located on a half-acre of land. However, because of the divorce action, his name was removed from the deed. (*Id.* at 49-50.) The Debtor also has in his possession five leather jackets which he wears, though they were not claimed on his Schedules. (*Id.* at 51-52.)

---

[12]    The Debtor's 2005 federal tax return shows a refund of $3,427.00 and his Connecticut tax return shows a refund of $315.00. (*See* Exh. D.) There is a "loss carryover" from a prior period. (*See id.*)

[13]    As of the Petition Date, Ms. Sokoloff was the sole owner of the vehicle, holding a loan on such which required payments of approximately $267.00 per month. At such time, the vehicle was being used by the Debtor to commute to and from his place of employment. For that usage, the Debtor was paying Ms. Sokoloff the full amount of the said loan payments by including an extra $83.00 in his weekly rent payments. At some time between the Petition Date and the Trial Date, the Debtor purchased the vehicle from Ms. Sokoloff, paying off her loan and taking out a loan in his name which then required similar payments of $267.00 per month. (Transcript at 64.)

The Debtor testified to making payments on several debts which he has voluntarily chosen

to repay, the monthly payments for which are listed on Schedule J.[14]  (*See* Case Doc. I.D. No. 2.)

The Debtor had been paying $33.00 per month on a "Chelsea Groton Visa" account as of the Petition

Date, but that account has since been paid in full.  (Transcript at 46.)  The Debtor maintains a loan

of approximately $20,000.00 borrowed from the Debtor's mother for monies borrowed during the

divorce process.  (*Id.* at 31.)  The Debtor had been making $200.00 monthly payments on that loan,

but fell behind on such payments about six months prior to Trial.  (*Id.*)  The Debtor also had been

paying $200.00 per month to his divorce attorney on a debt of $15,000.00 for services related to his

pending appeal of the Divorce Decree.  However, he had also fallen a "couple months" behind on

that obligation.  (*Id.* at 32-33.)

## III.    ANALYSIS

### A.    Plaintiff Chiappone's Alleged Property Interest in the 401k[15]

The Plaintiffs argue that Plaintiff Chiappone had, as of the Petition Date (and has now), a

property interest in the 401k pursuant to the Divorce Decree which is not subject to the Debtor's

discharge notwithstanding that she had not obtained issuance of a QDRO as of the Petition Date.

The Plaintiffs' position is supported by cases such as *Gendreau v. Gendreau (In re Gendreau),* 122

F.3d 815 (9th Cir. 1997), *cert. denied*, 523 U.S. 1005 (1998) and *Long v. Donahue (In re Long),* 148

B.R. 904 (Bankr. W.D. Mo. 1992).  Those cases hold that the relevant question is whether the non-

---

[14]    The Debtor did not attempt to reaffirm any debts in this case and the time for reaffirmations has passed.  *See* 11 U.S.C. § 524(c)(1).

[15]    This issue would be entirely moot under BAPCPA if BAPCPA applied here (which, as noted above, it does not).  *See* 11 U.S.C. § 523(a)(15) (as amended by BAPCPA).

debtor had a right to obtain a QDRO as of the petition date, not whether the QDRO actually had been obtained as of such date.  *See Gendreau* at 818; *Long* at 907.

The Debtor argues that the Debt in respect of the 401k is indeed a debt subject to Bankruptcy Code § 523(a)(15) precisely because Plaintiff Chiappone had *not* obtained a QDRO prior to the Petition Date.  *King v. King (In re King),* 214 B.R. 69 (Bankr. D. Conn. 1997) (Dabrowski, J.), supports the Debtor's position because, in *King,* Chief Judge Dabrowski held that the mere right to obtain a QDRO did not survive bankruptcy and a "qualified" QDRO was the only way around the anti-alienation provisions of the Employee Retirement Income Security Act of 1974.[16]  *See King* at 78-81.  *Cf. In re Marriage of Norfleet,* 612 N.E. 2d 939 (Ill. App. Ct. 1993) (holding right to obtain QDRO did not survive death of 401k beneficiary).

If  Plaintiff Chiappone had an enforceable right to obtain a QDRO as of the Petition Date, this court might be inclined to reexamine *King.*  That is because case law subsequent to *King* demonstrates that a right to obtain a QDRO is substantially more durable than the court in *King* had reason to believe.  *See, e.g., Patton v. Denver Post Corp.,* 326 F.3d 1148 (10th Cir. 2003) (right to obtain QDRO survived death of 401k beneficiary); *Hogan v. Raytheon, Co.,* 302 F.3d 854 (8th Cir. 2002) (same); *Trs. of the Dirs. Guild of America-Producer Pension Benefits Plans v. Tise,* 234 F.3d 415 (9th Cir. 2000) (same) (rejecting *Norfleet, supra*).

However, in this case Plaintiff Chiappone did not have an enforceable right to obtain a QDRO as of the Petition Date because of the pendency of the Appeal.  It is uncontested that Plaintiff

---

[16]    Section 1056(d)(1) of title 29 of the United States Code provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated [the "ERISA Anti-Alienation Provision"]." 29 U.S.C.A. § 1056(d)(1) (West 2007).  An assignment pursuant to a QDRO is a statutory exception to the foregoing.  *See* 29 U.S.C. § 1056(d)(3)(A).

Chiappone did not obtain issuance of a QDRO pursuant to the Divorce Decree prior to the Petition

Date. It also is uncontested that the Debtor commenced the Appeal prior to the Petition Date. The

Rhode Island Rule of Domestic Relations Procedure 62(d) (entitled "Stay Upon Appeal") states that

"the taking of an appeal from a judgment shall operate as a stay of execution upon the judgment

during the pendency of the appeal . . . . " Therefore, in this case enforcement of the Divorce Decree

was as of the Petition Date (and remains) stayed during the pendency of the Appeal by Rule 62(d).

Accordingly, as of the Petition Date, Plaintiff Chiappone could not have obtained issuance of a

QDRO pursuant to the Divorce Decree. Because there was no enforceable right to obtain a QDRO

pursuant to the Divorce Decree as of the Petition Date, based on reasoning substantially in

accordance with Chief Judge Dabrowski's reasoning in *King,* the court concludes that the Debt

indeed is a "debt" within the purview of Bankruptcy Code § 523(a)(15).[17]

### B.    Bankruptcy Code § 523(a)(5)

The Complaint seeks to have the Debts declared nondischargeable pursuant to Bankruptcy

Code §§ 523(a)(5) and/or 523(a)(15). The parties agree that the Attorney's Fees, the Temporary

Orders and the Rehabilitative Alimony are normally governed by Section 523(a)(5). However, the

Debtor argues that, because those awards are allegedly punitive in nature, the foregoing Debts are

not in the nature of alimony, maintenance, or support. For this proposition the Debtor relies on *King,*

---

[17]    Some courts that do not follow *King* conclude that the former spouse has a property
interest in a 401k account on a theory of "constructive trust" or the like. To the extent (if any) that
such theory is separable from a pre-petition enforceable right to obtain a QDRO, this court is not
persuaded. *Cf. Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365 (1990)
(constructive trust on pension plan disapproved as in violation of the ERISA Anti-Alienation
Provision.). *See also Boggs v. Boggs,* 520 U.S. 833, 851 (1997) ("[The ERISA Anti-Alienation
Provision] is mandatory and contains only two explicit exceptions, *see* §§ 1056(d)(2), (d)(3)(A),
which are not subject to judicial expansion." (*citing Guidry, supra*)).

214 B.R. at 75 ("An award intended as a punitive measure would be dischargeable under Section

523(a)(5)(B) since it does not serve a support purpose."). Similar language is found in *Cook v.*

*Bieluch (In re Bieluch)*, 219 B.R. 14, 20 (Bankr. D. Conn. 1998), *aff'd*, 216 F.3d 1071 (2d Cir.

2000), as discussed below. Therefore, it is asserted, those Debts should instead be evaluated under

Section 523(a)(15).

        1.      **Legal Standard**

Bankruptcy Code § 523(a) provides in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
>
>           . . .
>
>     (5) to a spouse [or] former spouse . . . of the debtor, for alimony to, maintenance for, or support of such spouse . . . in connection with a . . . divorce decree . . . , but not to the extent that –
>
>           . . .
>
>         (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support . . . .

11 U.S.C.A. § 523(a) (West 2005).

Section 523(a)(5) serves to discharge a debt designated as support which is not actually in

the nature of support.  *Peters v. Hennenhoeffer (In re Peters)*, 133 B.R. 291, 295 (S.D.N.Y. 1991),

*aff'd*, 964 F.2d 166 (2d Cir. 1992). In determining whether an award based on a divorce decree falls

within the scope of Section 523(a)(5), the court must undertake an analysis of "whether such debt

is in the 'nature of' alimony, maintenance or support" or whether it is of a different nature (such as

"punishment of one spouse for fault in the underlying dissolution"). *Bieluch*, 219 B.R. at 20 (*citing*

*Tavella v. Edwards (In re Edwards)*, 162 B.R. 83, 85-86 (D. Conn. 1993)). *See also Pauley v. Spong*

*(In re Spong)*, 661 F.2d 6, 9 (2d Cir.1981) ("[D]ischargeability must be determined by the substance

- 14 -

of the liability rather than its form.").  The nature of the putative "support" obligation is a mixed question of law and fact.  *Peters*, *supra* at 294 n.3.  Under this analysis, "initial recourse must be made to the language of the divorce decree."  *King*, 214 B.R. at 75 (*citing Tavella v. Edwards (In re Edwards)*, 172 B.R. 505, 508 (Bankr. D. Conn. 1994)).  Labels used in the divorce decree are not dispositive, but are afforded "considerable weight."  *Chudy v. Cooper (In re Cooper)*, 263 B.R. 164, 165 (Bankr. D. Conn. 2001), *aff'd*, 91 Fed. Appx. 713 (2d Cir. 2004).

With respect to awards of attorney's fees in divorce decrees, it has been said that:  "In any matrimonial action, whether it concerns the divorce, maintenance, support, custody, or post-decree proceedings implicating any of the foregoing, it is essential that each party be able to adequately represent its interests; accordingly, attorneys' fees owed to spouses are deemed to be in the nature of support," *Peters*, 133 B.R. at 295.  *See Falk & Siemer, LLP v. Maddigan (In re Maddigan)*, 312 F.3d 589, 595 (2d Cir. 2002); *Spong*, 661 F.2d at 9; *Seymour Ostrow, PC v. Schwartz (In re Schwartz)*, 53 B.R. 407, 411-12 (Bankr. S.D.N.Y. 1985).  However, some courts have found awards of such fees to be punitive in nature.  *See Bieluch*, 219 B.R. at 21-22 (holding the terms imposed by the divorce court upon a portion of the award of attorney's fees were intended as punishment for the violation of a court order and thus not in the nature of support); *Archer v. Archer (In re Archer)*, 277 B.R. 825 (Bankr. M.D. Ga. 2001) (holding an award of attorney's fees was intended as punishment for fraud on the part of the debtor).

### 2.        Application of Law to Fact

#### a.        The Attorney's Fees

There is no indication in the present case that the award of Attorney's Fees serves a punitive purpose.  The award itself appears to be a one-time payment, and no terms were placed on the order

which might indicate a punitive nature as was found in *Bieluch*. The Debtor argues that the phrase "the [Debtor] has not honored his monetary obligations to his family" exhibits a punitive intent. (*See* Exh. A ¶ 30, at 6.) However, the Second Circuit Court of Appeals noted that just such an obligation exists. *See Maddigan*, 312 F.3d at 596 ("By virtue of § 523(a)(5), [C]ongress has chosen between two competing interests-those of bankrupts and those of their former spouses and offspring-and it chose in favor of the latter." (citation and internal quotation marks omitted)). Taken in the context of the whole paragraph, it is apparent that the Family Court was taking into account the economic disparity between the parties in determining whether the Debtor should be ordered to pay such fees. The record is replete with evidence supporting the conclusion that Plaintiff Chiappone would be unable to pay the fees on her own and that she was financially dependent on the Debtor for payments on such obligations. Accordingly, because the Attorney's Fees are in the nature of a support obligation and the court is persuaded of an absence of punitive intent, the court concludes that the Attorney's Fees were not discharged under Section 523(a)(5).

### b.    The Temporary Orders

The Temporary Orders also are in the nature of a support obligation. The Debtor argues that several phrases utilized by the Family Court suggest a punitive intent. Specifically, that the Family Court found the Debtor "in willful contempt" for not making the Temporary Orders payments and that "the [Debtor] violated the letter, and worse, the spirit of the [T]emporary . . . [O]rders in this case . . . ." (*See* Exh. A ¶ 26, at 5.) However, those findings were used to justify the sixty-five/thirty-five percent split in the distribution of certain assets. (*See id.* ¶ 28, at 5 ("The disproportionate division of . . . assets is in no small measure due to the [Debtor's] contemptible behavior.").) They are completely irrelevant to the question of whether or not the Temporary Orders

themselves were of a punitive nature.  Plaintiff Chiappone testified that the Temporary Orders were meant to provide for her basic necessities such as utilities, car payments, and insurance.  (*See* Transcript at 12-13.)  Accordingly, the court concludes that the Temporary Orders are a support obligation which were not discharged under § 523(a)(5).

### c.    The Rehabilitative Alimony

The award of Rehabilitative Alimony also does not evince a punitive purpose.  As previously noted, labels used in the divorce decree are afforded considerable weight.  *Cooper*, 263 B.R. at 165. Thus, the fact that the Family Court used the term "rehabilitative alimony" creates a strong presumption in favor of that meaning.[18]  However, it is still necessary to discern the intent behind the award.  *See King*, 214 B.R. at 76 (analyzing whether the "lump sum alimony" award was a support obligation).  In the present case, the Family Court noted that it normally did not grant awards of rehabilitative alimony.  However, due to the significant sum of money awarded to Plaintiff Chiappone pursuant to the Divorce Decree, the Family Court recognized the possibility that the Debtor would not be able to satisfy such Debts in a short period of time.  (*See* Exh. A ¶ 31, at 6.) Thus, it appears the Family Court intended the Rehabilitative Alimony as a reasonable interim method by which the Debtor could support Plaintiff Chiappone until such time as he became able to comply fully with the Divorce Decree and Plaintiff Chiappone had access to such money for her own support.  This court is persuaded that the award in question was not punitive.  Accordingly, the court concludes that the Debt arising in respect of the Rehabilitative Alimony was not discharged pursuant to Section 523(a)(5).

---

[18]    Under Rhode Island law, all alimony is "rehabilitative."  *See* R.I. Gen. Laws. Ann. § 15-5-16(c)(2) (West 2007) ("Alimony is designed to provide support for a spouse for a reasonable length of time to enable the recipient to become financially independent and self-sufficient.").

## C.    Bankruptcy Code § 523(a)(15)

The parties are in agreement that dischargeability of the Debts in respect of the 401k (it having been determined above that the Plaintiff Chiappone does not have a property interest in it), the Business Share, and the Bank Account are governed by Section 523(a)(15). At the Trial, counsel for the Debtor stipulated that he was proceeding only on the basis of subsection (A) of Section 523(a)(15). (*See* Transcript at 7.)[19]

### 1.    Legal Standard

Bankruptcy Code § 523(a) provides in relevant part:

> (a)    A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
>
> . . .
>
>> (15)    not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce . . . or in connection with a . . . divorce decree . . . *unless* –
>>
>>> (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor . . . .

11 U.S.C.A. § 523(a) (West 2005) (emphasis added).

> The *standard* of proof under Section 523(a)(15), as with other Section 523(a) dischargeability exceptions, is a preponderance of the evidence. However, the *allocation* of the *burden* of proof under Section 523(a)(15) is somewhat unique. A plaintiff/former spouse bears the initial burden of demonstrating (i) that there is a "debt" owed to her; (ii) that such debt was "incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement [or] divorce decree"; and (iii) that such obligation is "not of the kind described in . . . [Code Section 523(a)](5)." Upon a successful initial showing by the plaintiff, the burden then shifts to the debtor-defendant to prove either one of the dischargeability "safe harbors" provided by subparagraph (A) . . . of Section 523(a)(15).

---

[19]    As the burden of proof rests on the Debtor (see below), the court need not discuss subsection (B).

*Gemza v. Rogan (In re Rogan),* 283 B.R. 643, 647 (Bankr. D. Conn. 2002) (Dabrowski, J.)

(alteration in original; last alteration added) (citations omitted).

> "[A]bility to pay" under subsection (A) of Section 523(a)(15) is not a static concept, compelling its assessment at a fixed point in time such as the bankruptcy petition date, the time of the trial, etc. Rather, it is a fluid concept which permits the Court to consider a debtor's prior employment, future employment opportunities, health status, etc. to determine whether the future wealth and earning capacity of that debtor will be sufficient to allow for payment of the subject debt.

*Id.* at 648.  In determining a debtor's "ability to pay" for Section 523(a)(15)(A) purposes,

> the court must look to the totality of the circumstances.   "It is not necessary to construct a budget for the debtor, but only to look to all the circumstances, including any sources of supplemental income which the debtor enjoys, the extent to which the debtor can control his income and the extent to which the debtor's expenses are self-imposed."

*Killeen v. Whittaker, III (In re Whittaker, III),* 225 B. R. 131, 143 (Bankr. E.D. La. 1998) (footnote

omitted).

> While there is a split of opinion among the courts which have considered this issue, and the statute does not make the answer clear, . . . an "all or nothing" approach to the discharge of property settlement debts is not mandated by the language of the statute.   In fact, the balancing provision set forth in subsection (B) suggests that Congress intended the bankruptcy courts to use their discretion and look to the equities of the parties when ruling on § 523(a)(15) complaints. Many other courts have carefully analyzed the language of this provision, the legislative history of § 523(a)(15), and the Supreme Court's rulings on analogous statutes, and reached the conclusion that the courts have the authority to find debts partially dischargeable under this provision.

*Rushlow v. Rushlow (In re Rushlow),* 277 B.R. 216, 223 (Bankr. D. Vt. 2002) (citing cases adopting

the same position) (citations omitted).

## 2. **Application of Law to Fact**

### a. **Debts Re: the Business Share and the Bank Account**

Under the totality of the circumstances presented here and for the reasons discussed below, the court is persuaded that the Debtor does not have the "ability to pay" the Debts respecting the Business Share and the Bank Account (collectively, the "§ 523(a)(15) Debts") within the purview of Bankruptcy Code § 523(a)(15)(A).

As an initial matter, the court notes that, except for his share of the 401k (see discussion in subpart b., below), the Debtor has no substantial assets to liquidate to pay those Debts. Furthermore, given that Congress has placed the 401k beyond the reach of the Plaintiff Chiappone (except pursuant to a QDRO), it is inappropriate for the court to consider the possibility of the Debtor's taking a loan from or otherwise obtaining a distribution from his portion of the 401k in making the "ability-to-pay" determination relative to the § 523(a)(15) Debts. *Cf. In re Stones,* 157 B.R. 669 (Bankr. S.D. Cal. 1993). Accordingly, the Debtor's "ability to pay" those Debts will derive almost entirely from wages, bonuses, tax refunds and the like. Given the foregoing, the level of the Debtor's income and living expenses,[20] the substantial level of the Debtor's Section 523(a)(5) debt load and the Debtor's age, the court deems it appropriate to analyze the Debtor's "ability to pay" the § 523(a)(15) Debts from the prospect of an involuntary payment plan (which is more likely to produce the earliest payment) effectuated through tax refund intercepts,[21] "[i]ncome withholding .

---

[20] The court does not accept the Debtor's testimony as to his expenses uncritically. For example, the court deems the "voluntary" payments to Chelsea Groton VISA, to his mother and to his divorce attorney not to be valid expenses for this purpose. In any event, the Debtor testified that the Chelsea Groton VISA has been paid in full. (*See* Transcript at 46.)

[21] *See* Conn. Gen. Stat. §§ 52-362e(a), 52-362e(b).

. . for support,"[22] and "[e]xecution on wages after judgment"[23] procedures.  Using that analysis (the

court's "work papers" are annexed hereto as Annex I), the Debtor will not have satisfied his Section

523(a)(5) Debts and the § 523(a)(15) Debts until he is about sixty-nine years old (well past

customary retirement age), and that under a rigorous payment plan.  If the Debtor is granted some

relief from that plan, he will have to work at least into his seventies to satisfy the § 523(a)(15) Debts.

In light of all of the foregoing, the court is persuaded that the § 523(a)(15) Debts should be

discharged.

### b.    Debt Re: 401k

The Debt in respect of the 401k stands on a different footing from the § 523(a)(15) Debts.

First of all, unlike those other Debts, the funds to pay it are available (subject only to the Plaintiff's

obtaining an appropriate QDRO which she will be free to do if the 401k Debt is held not discharged

and the Appeal is resolved in her favor).  The actual act of transferring the funds (pursuant to a

QDRO) will not impose any financial hardship on the Debtor, likely requiring only the completion

of necessary forms.  Division of the 401k in accordance with the Divorce Decree still will leave the

Debtor with at least some provision for his retirement.  Finally, this court is relieving the Debtor

from the burden of the § 523(a)(15) Debts.  Accordingly, the court finds that the Debtor has the

"ability to pay" the Debt in respect of the 401k within the purview of Section 523(a)(15)(A).

### D.    11 U.S.C. § 524(a) (Rehabilitative Alimony)

As noted above, in the Divorce Decree the Family Court awarded Rehabilitative Alimony

to Plaintiff Chiappone in the amount of $125.00 per week payable until all of the other Debts had

---

[22]    See Conn. Gen. Stat. §§ 52-362(e), 52-362(n).

[23]    See Conn. Gen. Stat. § 52-361a(f).

been paid by the Debtor.  However, this court now has determined that the Debts in respect of the

Bank Account and the Business Share were discharged in this chapter 7 case.  As a result, the court

here concludes that the Rehabilitative Alimony as it presently is conditioned (*i.e.,* dependent (in part)

on the Debtor's non-payment of the discharged Debts) is unenforceable pursuant to Bankruptcy Code

§ 524(a).[24]  *Cf.* 4 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 524.02[2] (15 ed.

rev. 2006) ("*Collier on Bankruptcy*").  However, that does not mean that Plaintiff Chiappone is left

without a remedy for the reasons which follow.

---

[24]    Section 524(a) provides:

(a) A discharge in a case under this title–

   (1) voids any judgment at any time obtained, to the extent that such judgment is a
determination of the personal liability of the debtor with respect to any debt
discharged under section 727 . . . this title, whether or not discharge of such debt is
waived;

   (2) operates as an injunction against the commencement or continuation of an
action, the employment of process, or an act, to collect, recover or offset any such
debt as a personal liability of the debtor, whether or not discharge of such debt is
waived; and

   (3) operates as an injunction against the commencement or continuation of an
action, the employment of process, or an act, to collect or recover from, or offset
against, property of the debtor of the kind specified in section 541(a)(2) of this title
that is acquired after the commencement of the case, on account of any allowable
community claim, except a community claim that is excepted from discharge under
section 523 . . . of this title, or that would be so excepted, determined in accordance
with the provisions of sections 523(c) and 523(d) of this title, in a case concerning
the debtor's spouse commenced on the date of the filing of the petition in the case
concerning the debtor, whether or not discharge of the debt based on such community
claim is waived.

11 U.S.C.A. § 524(a) (West 2005).

- 22 -

Unless alimony is waived or otherwise expressly made nonmodifiable, under Rhode Island law an award of alimony may be modified if there has been a substantial change in the circumstances of the respective parties. *See, e.g., Goldman v. Goldman,* 543 A.2d 1304 (R.I. 1988). *See also* R.I. Gen. Laws Ann. § 15-5-16(c)(2) ("After a decree for alimony has been entered, the court may from time to time upon the petition of either party review and alter its decree relative to the amount and payment of the alimony, and may make any decree relative to it which it might have made in the original suit."). Here, Plaintiff Chiappone did not waive alimony nor does the Divorce Decree state that the award of Rehabilitative Alimony was nonmodifiable.[25] Accordingly, this court concludes that the Divorce Decree is modifiable in that respect and that the determination that the Rehabilitative Alimony *as presently conditioned* is unenforceable pursuant to Section 524(a) is without prejudice to Plaintiff Chiappone's right to seek a modification of the Rehabilitative Alimony under state law. Furthermore, Section 524(a) is not an impediment to the Family Court's taking into consideration that Plaintiff Chiappone will not be paid the discharged Debts as a relevant fact in considering a modification of the subject alimony award provided that there is no attempt to implement an "end run" around the discharge. *Accord* 4 *Collier on Bankruptcy* ¶ 524.02[2][a], at 524-16 ("[S]ince alimony and support are ongoing obligations that usually depend on the current circumstances of the parties, a state court is not precluded from taking the discharge of debts into account in modifying these obligations."); *see also Siragusa v. Siragusa (In re Siragusa),* 27 F.3d 406 (9th Cir. 1994) (Alimony modification based on debtor's discharge in bankruptcy of approximately a $1.2 million property settlement obligation did not violate the discharge injunction,

---

[25]    Arguably, the Rhode Island courts would modify the Rehabilitative Alimony under these circumstances (if otherwise appropriate under state law) even if there had been a waiver of alimony or the award was nonmodifiable. *Cf. Hopkins v. Hopkins,* 487 A.2d 500 (R.I. 1985).

where nothing in the record suggested that the divorce court was attempting to reinstate the property

settlement, where the amount awarded in alimony was not a substitute for the amount of the

discharged property settlement, and where the alimony modification merely took into account the

fact that the debtor's ex-wife would no longer receive the property settlement payments upon which

the original alimony was premised.).[26]

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the court concludes that the Debts in respect of the Attorney's

Fees, the Temporary Orders, and the Rehabilitative Alimony were not discharged in this chapter 7

case pursuant to Section 523(a)(5).  The court further concludes that the Debt in respect of the 401k

was not discharged in this chapter 7 case pursuant to Section 523(a)(15)(A).  The court concludes

that the Debts in respect of the Business Share and the Bank Account were discharged in this chapter

7 case pursuant to Section 523(a)(15).  Finally, the court concludes that the Rehabilitation Alimony

as it is presently conditioned is unenforceable pursuant to Bankruptcy Code § 524(a) but that the

foregoing conclusion is without prejudice to Plaintiff Chiappone's right to seek an appropriate

---

[26]    The court convened a status conference on November 14, 2007 at which counsel for
the parties participated.  (*See* A.P. Doc. I.D. No. 48 (Order Scheduling Status Conference).)  During
those proceedings, counsel for all parties agreed that the Rehabilitative Alimony was modifiable
under Rhode Island law and accepted the disposition of the narrow Section 524(a) issue addressed
in this subpart D.  (*See* Oral Record of 11/14/2007 hearing at 2:42:30 *et seq.*)

modification of the Divorce Decree with respect to the alimony award.  Judgment to that effect will

enter.

Dated: November 21, 2007                              BY THE COURT

**Lorraine Murphy Weil**
**United States Bankruptcy Judge**

## ANNEX I

**Assumptions**

- Disposable Earnings per year (including bonus, "YDE") = $40,000.00 (approximate)[1]

- YDE statutorily available for involuntary payment of Section 523(a)(5) Debts = $24,000.00 (approximate, "Support YDE")[2]

- YDE statutorily available for involuntary payment of Debts respecting the Business Share and the Bank Account = $10,000.00 (approximate, "Non-Support YDE")[3]

- Federal and State Tax Refunds are assumed to be yearly events in the aggregate of $3,600 per year ("Yearly Tax Refunds").

- Child Support
  - 1 year at $7,800.00 per year
  - 5 years at $3,900.00 per year[4]

---

[1]     For ease of computation, wages and bonuses are held level throughout. However, the court also assumes (solely for this purpose) that the Rehabilitative Alimony will not be subject to upward modification.

[2]     *See* Conn. Gen. Stat. § 52-362(e) (as amended October 1, 2007) (making 15 U.S.C.A. § 1673 applicable here). With respect to the maximum amount of disposable earnings that may be garnished for payment of support orders, 15 U.S.C. § 1673 establishes a ceiling of 65% of weekly income. *See* 15 U.S.C.A. § 1673(b)(2). In its calculation, the court uses a 60% ceiling for ease of calculation.

[3]     *See* Conn. Gen. Stat. § 52-361a (ceiling of 25% of YDE).

[4]     As of the Trial Date, the children were 10 and 16 years old. The Debtor currently pays total child support of $150.00 per week. The court assumes that the Debtor will pay child support for the children until they are 18 years old. Therefore, he will pay $150.00 for one year (i.e., until the 17 year old is 18 years old) and $75 for an additional 5 years (i.e., until the 12 year old is 18 years old).

## **YEAR 1**

## **Section 523(a)(5) Debt Payments**

|                          |   |            |                                                              |
|--------------------------|---|------------|--------------------------------------------------------------|
|                          |   | $24,000.00 | (Support YDE)                                                |
| current portion paid     | - | 4,200.00   | (child support after intercepts of Yearly Tax Refunds, ("Tax Intercepts")) |
| paid in full             | - | 15,000.00  | (Attorney Fees)[5]                                           |
| $4,800 paid              | - | 6,500.00   | (current Rehabilitative Alimony)[6]                         |
| unpaid                   | - | 24,000.00  | (Temporary Orders)                                           |
|                          |   | ($25,700.00, approximate) |                                               |

## **§ 523(a)(15) Debt Payments** = $0.00[7]

## **YEAR 2**

## **Section 523(a)(5) Debt Payments**

|                          |   |            |                                                              |
|--------------------------|---|------------|--------------------------------------------------------------|
|                          |   | $24,000.00 | (Support YDE)                                                |
| current portion paid     | - | 300.00     | (child support after Tax Intercepts)                        |
| paid in full             | - | 8,200.00   | (current Rehabilitative Alimony plus arrearage from Year 1) |
| $15,500 paid             | - | 24,000.00  | (Temporary Orders)                                           |
|                          |   | ($ 8,500.00, approximate) |                                               |

## **§ 523(a)(15) Debt Payments** = $0.00

---

[5]     The Attorney's Fees are support obligations under Connecticut law. *See Murphy v. Murphy,* 180 Conn. 376, 380-81 (1980); *Larson v. Larson,* 89 Conn. App. 57, *cert. denied*, 274 Conn. 915 (2005). *See also Mainelli v. Whitman (In re Whitman)*, 29 B.R. 362 (Bankr. R.I. 1983) (concluding that under Rhode Island law attorney's fee was in nature of support).

[6]     Prepetition arrearages (if any) are not considered.

[7]     *See Long Island Trust Co. v. U.S. Postal Serv.,* 647 F.2d 336, 341 (2d Cir. 1981) ("[I]f 25% or more of an individual's disposable earnings were withheld pursuant to a garnishment for support, and the support garnishment has priority in accordance with State law, [15 U.S.C. § 1673] does not permit the withholding of any additional amounts pursuant to an ordinary garnishment which is subject to the restrictions of section (1673(a))." (citing 29 C.F.R. § 870.11)).

- 2 -

## YEAR 3

### Section 523(a)(5) Debt Payments

|  |  | $24,000.00 | (Support YDE) |
|---|---|---|---|
| paid in full | - | 300.00 | (child support after Tax Intercepts) |
| paid in full | - | 6,500.00 | (current Rehabilitative Alimony) |
| paid in full | - | 8,500.00 | (residue of Temporary Orders) |
|  |  | $ 8,700 Surplus (approximate) | |

### § 523(a)(15) Debt Payments = $0.00[8]

## YEAR 4

### Section 523(a)(5) Debt Payments

|  |  | $24,000.00 | (Support YDE) |
|---|---|---|---|
| paid in full | - | 300.00 | (child support after Tax Intercepts) |
| paid in full | - | 6,500.00 | (current Rehabilitative Alimony plus arrearage) |
|  |  | $17,200.00 Surplus (approximate) | |

### § 523(a)(15) Debt Payments

|  |  | $ 3,200.00 | (available Non-Support YDE)[9] |
|---|---|---|---|
| $3,200.00 paid | - | 19,500.00 | (Business Share) |
| unpaid | - | 41,600.00 | (the Bank Account) |
|  |  | ($57,900.00, approximate) | |

---

[8]    No more than 25% of the Debtor's disposable income (or $10,000.00) may be garnished to pay his non-support obligations. *See Long Island Trust Co., supra.* Although the Debtor has a surplus of $8,700.00 in Year 3, no portion of that surplus may be used to pay the Section 523(a)(15) Debts because the Debtor already paid 38.25% of his earnings (or $15,300.00) for his support obligations.

[9]    Because the Debtor only paid 17% (or $6,800.00) of his disposable income in Year 4 for his support obligations, 8% (or $3,200.00) may be garnished for his Section 523(a)(15) Debts. *See* n.8, *supra.*

**YEAR 5**

**Section 523(a)(5) Debt Payments** **-** same as in Year 4 yielding same surplus of Support YDE

**§ 523(a)(15) Debt Payments**

|  |  |  |  |
|---|---|---|---|
|  |  | $ 3,200.00 | (available Non-Support YDE) |
| $3,200.00 paid | - | 16,300.00 | (Business Share) |
| unpaid | - | 41,600.00 | (Bank Account) |
|  |  | ($54,700.00, approximate) | |


**YEAR 6**

**Section 523(a)(5) Debt Payments** - same as in Year 4 yielding same surplus of Support YDE.

**§ 523(a)(15) Debt Payments**

|  |  |  |  |
|---|---|---|---|
|  |  | $ 3,200.00 | (available Non-Support YDE) |
| $3,200.00 | - | 13,100.00 | (residue of Business Share) |
| unpaid | - | 41,600.00 | (Bank Account) |
|  |  | ($51,500.00, approximate) | |


**YEAR 7**

**Section 523(a)(5) Debt Payments**

|  |  |  |  |
|---|---|---|---|
|  |  | $24,000.00 | (Support YDE) |
| paid | - | 6,500.00 | (current Rehabilitative Alimony) |
|  |  | $17,500.00 Surplus (approximate) | |

- 4 -

**§ 523(a)(15) Debt Payments**

|  |  | $ 3,500.00 | (available Non-Support YDE)[10] |
|---|---|---|---|
|  | + | $ 3,600.00 | (Tax Refund)[11] |
| $7,100.00 paid | - | $ 9,900.00 | (residue of Business Share) |
| unpaid | - | 41,600.00 | (Bank Account) |
|  |  | ($44,400.00, approximate) |  |

## YEAR 8

**Section 523(a)(5) Debt Payments** - same as in Year 7 yielding same surplus of Support YDE.

**§ 523(a)(15) Debt Payments**

|  |  | $ 3,500.00 | (available Non-Support YDE) |
|---|---|---|---|
|  | + | $ 3,600.00 | (Tax Refund) |
| paid in full | - | 2,800.00 | (residue of Business Share) |
| $4,300.00 paid | - | 41,600.00 | (Bank Account) |
|  |  | ($37,300.00, approximate) |  |

## YEAR 9

**Section 523(a)(5) Debt Payments** - same as in Year 7 yielding same surplus of Support YDE.

**§ 523(a)(15) Debt Payments**

|  |  | $ 3,500.00 | (available Non-Support YDE) |
|---|---|---|---|
|  | + | $ 3,600.00 | (Tax Refund) |
| $7,100.00 paid | - | 37,300.00 | (Bank Account) |
|  |  | ($30,200.00, approximate) |  |

---

[10]     Because the Debtor only paid 16.25% (or $6,500.00) of his disposable income in Year 7 for his support obligations, 8.75% (or $3,500.00) may be garnished for his Section 523(a)(15) Debts.  *See* n.8, *supra.*

[11]     The amount of Tax Refunds is likely to decline due to the conclusion of child support payment.

**YEARS 10 THROUGH 13**

**Section 523(a)(5) Debt Payments** - same as in Year 7 yielding same surplus per year of Support YDE.

**§ 523(a)(15) Debt Payments** - $7,100 per year retiring all but $1,800.00 (approximate) of Bank Account Debt in full at end of Year 13.


**YEAR 14**

All Section 523(a)(5) Debts and § 523(a)(15) Debts retired.